IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DEBORAH A. SEECH,                           )
                                            )
                Plaintiff,                  )
                                            )
        v.                                  )       CIVIL ACTION NO. 09-701
                                            )
MICHAEL J. ASTRUE,                          )
COMMISSIONER OF SOCIAL                      )
SECURITY,                                   )
                                            )
                Defendant.                  )

## MEMORANDUM OPINION

CONTI, District Judge.

## I.      INTRODUCTION

Pending before the court are the cross-motions of plaintiff Deborah A. Seech ("Seech" or

"plaintiff") and defendant Commissioner of Social Security ("Commissioner" or "defendant"),

seeking summary judgment.  Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) and 42

U.S.C. § 1383(c)(3), which incorporates 42 U.S.C. § 405(g), seeking review of the final

determination of the Commissioner denying plaintiff's application for disability insurance

benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-33, and

supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. §§

1381-83(f).  The record was developed at the administrative level.

## II.     PROCEDURAL HISTORY

Seech filed applications for DIB and SSI benefits on March 13, 2007, alleging disability

since January 7, 2007,[1] due to recurring epileptic seizures.  (R. at 101-10; 145.)  Plaintiff's claims

---

[1] Plaintiff initially claimed a disability onset date of December 31, 2003, but amended the date at the
administrative hearing to January 7, 2007. (R. at 101; 104; 145; 58-60).

were initially denied, and she filed a timely request for an administrative hearing.[2]  (R. at 81-89; 90-91.)  A hearing was held on November 6, 2008, before an administrative law judge ("ALJ").  (R. at 18-61.)  Plaintiff, who was represented by counsel, and a vocational expert ("VE"), appeared and testified.  (*Id.*)  The ALJ issued an unfavorable decision on December 9, 2008, finding that plaintiff was "not disabled" within the meaning of the Act.  (R. at 7-17.)  The ALJ's decision became the Commissioner's final decision on May 7, 2009, when the Appeals Council denied plaintiff's request for review.  (R. at 1-3.)  Plaintiff's administrative remedies being exhausted, she brought the instant action seeking review of the Commissioner's final decision. The matter is before this court on the parties' cross-motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

## III.     BACKGROUND

### Plaintiff's background

Seech was born on January 30, 1958. (R. at 101.)  She is currently fifty-two years old and was forty-nine years old at the time she applied for benefits and fifty years old at the time of the administrative hearing and the ALJ's decision. (*Id*.).

Seech graduated from high school in 1976. (R. at 150).  She has past relevant work experience as a clerical worker, a cashier at a department store, and work at a grocery store in hot foods, the fish department, and the bakery. (R. at 152).  She stopped working on December 31, 2003, due to her condition.  (R. at 145.)  She was, however, able to complete an approximately

---

[2]This case was randomly selected by the Commissioner to test modifications to the disability determination process.  The reconsideration step of the administrative review process was eliminated and the case was escalated to the hearing level.  (R. at 82-83; 87); *see* 20 C.F.R. § 404.906(a).

five-month course in medical billing and coding at Duff's Business Institute in 2004, and to work a one-month internship thereafter.  (R. at 25-26; 28; 150.)  Following the internship, Seech went on numerous job interviews, but was unsuccessful in securing employment in a medical billing and coding capacity.  (R. at 26-29.)  She stopped seeking employment after she broke her foot during an epileptic seizure in January 2007.  (R. at 27-30.)

**Dr. Kelly**

Seech was fourteen years old when she was first diagnosed with epilepsy.  (R. at 30.) Kevin Kelly, M.D., ("Dr. Kelly"), has been her treating neurologist for over ten years.  (R. at 268).  Since her amended disability onset date of January 7, 2007, Dr. Kelly's treatment notes reveal that Seech suffered a grand mal seizure on January 6, 2007, and broke her right foot. (R. at 259).  Seech reported another grand mal seizure in February 2007 during which she suffered a laceration above her right eye. (*Id.*).  She also reported having petit mal, or partial, seizures that month. (*Id.*).

Seech reported some seizures for two days after changing medications in April 2007, but none afterward.  (R. at 257.)  She suffered a grand mal seizure with no reported associated trauma in June 2007.  (*Id.*)  In June, July, and August 2007, Seech had telephonic consultations with Dr. Kelly regarding her medication regimen.  (*Id.*)

Dr. Kelly reported in September 2007 that Seech experienced poor control of her seizures in the past year, having complex partial seizures daily, and suffered three grand mal seizures in 2007.  (R. at 268-69.)  During a complex partial seizure, Dr. Kelly explained that Seech will suffer a lapse of consciousness, lasting "only a few seconds."  (R. at 268.)  Seech described being

tired and confused after these seizures. (R. at 34-35; 142). She reported that the frequency of her partial seizures varies, but can occur up to five times per day. (R. at 32-33).

Dr. Kelly's treatment notes from October 5, 2007, indicate that Seech was improving regarding her seizure control, but that hot weather and humidity impacted her seizure control in a negative way. (R. at 257). Seech reported continuing to have two small seizures per day. (*Id.*).

Dr. Kelly prescribed Depakote[3] and Dilantin[4] at various dosages to Seech to try to control the seizures and minimize breakthrough seizures. (R. at 166; 257; 259; 262; 268.) Seech experienced decreased energy, tiredness, drowsiness, and grogginess to varying degrees as a result of the medication. (R. at 34; 142; 166.) She did testify, however, that if her sleeping routine is normal, she is able to stay awake while taking the medication. (R. at 36.) The effectiveness of the medicine in controlling her seizures has been inconsistent. (R. at 268.)

In a letter written to Seech's attorney dated September 14, 2007, Dr. Kelly expressed his opinion regarding Seech's ability to engage in consistent work activity. (R. at 268-69.) Dr. Kelly detailed Seech's history of seizures and explained how recently she was experiencing poor control of her seizures, having complex partial seizures daily, as well as experiencing grand mal seizures with significant trauma in January, February, and June 2007. (*Id.*) Dr. Kelly stated that because her daily complex partial seizures result in impaired or loss of consciousness, in addition to her intermittent grand mal seizures with associated trauma, she was incapable of performing

---

[3]Depakote is used for the treatment of mania, epilepsy and migraines. Physicians' Desk Reference 423 (63rd ed. 2009). Adverse side effects include: somnolence, dyspepsia, nausea, etc. Id. at 426.

[4]Dilantin "is an anti-epileptic drug" and "is used to control seizures." http://www.drugs.com/dilantin.html (last visited 7/30/2010). Adverse side effects include: swollen glands, fever, skin rash, confusion, loss of balance or coordination, tremors, etc. Id.

any sustained work activity. (*Id.*) Dr. Kelly indicated that appropriate antiepileptic drug dosing regimens have not been consistently successful, making a safe employment environment "impossible." (*Id.*) He noted that in his ten years of treating her, he found her to be an honest and credible informant regarding her condition and seizure activity. (*Id.*)

### Other medical treatment

On January 6, 2007, Seech suffered a grand mal seizure during the course of which she injured and broke her right foot. (R. at 259.) Seech sought treatment at the emergency department of Jefferson Regional Medical Center the next day for her foot injury. (R. at 199.) The ER physician diagnosed a right ankle/foot sprain and discharged Seech with vicodin, a walker, and ankle gel. (R. at 200.)

Seech reported to Century III Medical Associates on January 15, 2007, for follow-up of her right foot pain. (R. at 181-82.) She was prescribed Naproxen[5] and Vicodin[6] and advised to use an ice pack and Ace bandage. (R. at 182.) A February 27, 2007 appointment with Century III Medical Associates revealed no improvement in Seech's right foot, and Seech was instructed to use over-the-counter Advil for pain and referred to a podiatrist. (R. at 179-80.)

Seech returned to Jefferson Regional on March 8, 2007, for additional x-rays of her right foot. (R. at 196.) A healing fracture at the distal end of left fifth proximal phalanx was observed. (*Id.*) X-rays were again performed on March 29, 2007, at Jefferson Regional revealing a healing or healed fracture involving right second and third metatarsal bases. (R. at

---

[5]Naproxen is a nonsteroidal anti-inflammatory drug. Physicians' Desk Reference 2632 (63rd ed. 2009).

[6]Vicodin is used "for the relief of moderate to moderately severe pain." Physicians' Desk Reference 529 (63rd ed. 2009).

191.)  Additional x-rays from May 22, 2007, of the right foot, and September 13, 2007, of the left foot, performed at Jefferson Regional respectively indicated degenerative changes and minimal degenerative changes.  (R. at 236-37.)

Seech was treated at Gateway Foot and Ankle by Kathleen M. O'Connell, D.P.M., ("Dr. O'Connell") for her foot condition.  (R. at 215-19; 241-55.)  Treatment notes from March 7, 2007, reveal Seech continued to experience pain in her right foot.  (R. at 241.)  Dr. O'Connell assessed a metatarsal stress fracture and ordered additional x-rays.  (*Id.*)  On March 9, 2007, Dr. O'Connell confirmed a fracture of the second, third, and fourth metatarsal, in addition to the fracture of the base of the proximal phalanx of the fifth digit assessed by the radiologist the prior day.  (R. at 242.)  Dr. O'Connell observed a malalignment of the lis franc joint.  (*Id.*)  She advised Seech to continue wearing a CAM boot and to use a walker.  (*Id.*)

Seech was seen by Dr. O'Connell on March 29, 2007, for her continuing right foot pain.  (R. at 244-45.)  At that time, Seech, although she still experienced swelling and pain, reported feeling much better while wearing the CAM boot and feeling that her pain was decreasing.  (R. at 244).

On March 29, 2007, Dr. O'Connell completed a Medical Source Statement of Claimant's Ability to Perform Work-Related Physical Activities form for the Commonwealth of Pennsylvania Bureau of Disability Determination.  (R. at 212-14.)  Dr. O'Connell indicated that Seech should never bend, stoop, crouch, or climb and only occasionally kneel or balance until her fractures completely consolidated and healed.  (R. at 212.)  Dr. O'Connell determined that Seech should not be exposed to moving machinery or vibration.  (*Id.*)  Seech's lifting and carrying capacity should be limited to two to three pounds, but only occasionally, because of the fractures

in the second and third metatarsal of her right foot.  (R. at 213.)  Dr. O'Connell assessed Seech's capacity to stand and walk during an eight-hour day to be limited to one to two hours, and that a hand-held assistive device was required for balance and ambulation.  (*Id.*)  Dr. O'Connell found that Seech was limited in the lower extremity in her ability to push or pull due to the limited weight bearing of her right foot. (*Id.*).

On April 23, 2007, Dr. O'Connell's colleague, Valerie M. Winter, D.P.M., ("Dr. Winter"), examined Seech.  (R. at 246-47.)  Dr. Winter advised that Seech may progress to sneakers, but should continue to use the CAM boot when walking long distances.  (R. at 246.)  New x-rays were ordered for Seech's next visit.  (*Id.*)

Dr. Winter examined Seech on May 23, 2007, and noted signs of progressive healing of the fractures on radiographic review.  (R. at 248.)  New x-rays were ordered for the next visit, and Dr. Winter indicated the CAM boot should be utilized.  (*Id.*)  Seech's next appointment was July 11, 2007, and Dr. Winter noted continuing improvement and indicated that she would attempt to obtain hydrotherapy for Seech.  (R. at 250.)

On September 11, 2007, Seech presented to Dr. Winter with a new complaint of pain in the left foot of unknown origin.  (R. at 252-53.)  Dr. Winter's impression was a metatarsal fracture, neuroma, tendonitis, or capsulitis.  (R. at 253.)  She ordered x-rays and instructed Seech to wear the CAM boot on the left foot until her next appointment.  (*Id.*)

Seech returned to see Dr. Winter on September 19, 2007, and reported the severity of her left foot pain was resolving.  (R. at 254.)  Dr. Winter reviewed the x-ray results and observed no evidence of fracture, tumor, infection, or congenital abnormality.  (R. at 255.)  She advised Seech to continue exercising and would attempt to obtain water therapy.  (*Id.*)

On May 2, 2007, a Physical Residual Functional Capacity Assessment form was completed by a disability adjudicator based upon a review of the record. (R. at 222-28.) Exertional limitations were found to be that Seech could occasionally lift or carry fifty pounds, and frequently lift or carry twenty-five pounds. (R. at 223.) She could stand or walk approximately six hours in an eight-hour workday, and sit about six hours in an eight-hour workday. (*Id.*) Her ability to push or pull was limited to the same extent as that for lifting and carrying. (*Id.*) Postural limitation findings reveal that climbing ramps and stairs, balancing, stooping, kneeling, crouching, and crawling should only occasionally be performed. (R. at 224.) Seech should never climb ladders, ropes, or scaffolds. (*Id.*) Environmental limitations were established to avoid all exposure to vibration and hazards such as machinery and heights. (R. at 225.)

The disability adjudicator found Seech's statements to be only partially credible based upon her medical history, types of treatment, and activities of daily living. (R. at 227.) The disability adjudicator determined that the functional capacity report completed by Dr. O'Connell overestimated Seech's functional limitations, and that the limitations found by Dr. O'Connell were inconsistent with the evidence contained in the record. (R. at 227-28.) The report of Dr. O'Connell was said to have been given appropriate weight in the disability adjudicator's assessment. (R. at 228.)

### Administrative proceedings

Seech reported her activities of daily living to include watching television, talking on the phone, and using the computer. (R. at 138.) She takes care of her cats and sometimes helps with

dinner. (R. at 134.) Seech does ironing about twice a week and usually helps her mother with the grocery shopping. (R. at 136-37.)

Seech's testimony at the administrative hearing on November 6, 2008, revealed that she stopped working in 2003 to attend business school, graduated in 2004, and was seeking employment until she broke her foot in 2007. (R. at 25.) Seech testified that in September 2007 Dr. Winter diagnosed her with arthritis in both knees and legs. (R. at 23-25.) She stated that she was diagnosed with epilepsy when she was fourteen and that she had three grand mal seizures in 2007. (R. at 30-31.) She related that she had not experienced a grand mal seizure since June 2007, but she suffered approximately five petit mal seizures per day. (R. at 31-33.) Her petit mal seizures last for approximately one minute. (R. at 34.) She testified that her medication makes her tired and drowsy. (*Id.*)

Seech testified that she can prepare some light meals, could help with the shopping, and could walk for forty-five minutes before needing to sit down for fifteen minutes. (R. at 40-41). When she tries to clean around the house she tends to stop in the middle of it, but she is able to take care of her cats. (R. at 43-44.) She is able to lift eighteen pounds. (R. at 45.) Seech testified that she takes naps every day as a result of the fatigue she experiences due to the seizures and medication. (R. at 47, 49.)

Seech detailed her past relevant work which included working at a grocery store, working at a department store, and performing a clerical job for Allegheny County. (R. at 50-53.)

The testimony of the VE at the administrative hearing indicated that a hypothetical individual sharing Seech's age, education, work experience, and residual functional capacity

("RFC"),[7] which was defined as the ability to carry twenty pounds occasionally, ten pounds frequently, stand and walk six hours in an eight-hour workday, sit six hours in an eight-hour workday, no more than occasional climbing, balancing, stooping, kneeling, crouching, or crawling, with no exposure to vibration or hazards such as machinery or heights, could perform her past relevant work and other work existing in the national economy.  (R. at 54-55).

The VE testified that if the hypothetical individual were to be off-task more than ten to fifteen percent of the workday, or were to take naps or lie down during the workday outside of normal breaks, no jobs would be available to such an individual in the national economy.  (R. at 56-58.).

After determining that Seech met the insured status requirements of the Act through September 30, 2008, and had not engaged in substantial gainful activity since her amended disability onset date, the ALJ found Seech's epilepsy and arthritis to be severe impairments, but did not meet or medically equal, either singly or in combination with other alleged impairments, any of the listings in 20 C.F.R. Part 404, subpart P, appendix 1, regulations No. 4 (20 C.F.R. §§ 404.1520(d) and 416.920(d)).  (R. at 12-13.)  The ALJ determined that Seech maintained the RFC to engage in work activity at the light exertional level subject to certain modifications, which allow for lifting and carrying twenty pounds occasionally and ten pounds frequently, standing and walking for six hours, sitting for six hours, with a sit/stand option at forty-five minutes, occasional climbing, balancing, stooping, kneeling, crouching, and crawling, no exposure to vibration, a proscription against working near hazards including machinery or

---

[7]Residual functional capacity is "the most [the claimant] can still do despite [her] limitations." 20 C.F.R. § 416.945(a).

heights, simple, routine tasks, short simple instructions, simple work-related decisions with few

workplace changes, and no production rate pace.  (R. at 13.)  Ultimately, the ALJ concluded that

although Seech was unable to return to her past relevant work as a grocery store clerk, a sales

cashier, or a clerical office worker, there were a significant number of jobs which existed in the

national economy that Seech could perform, considering her age, education, work experience,

and RFC.  The ALJ concluded that Seech was not disabled within the meaning of the Act at any

time relevant to the rendering of the ALJ's decision.  (R. at 15-17.)

## IV.    STANDARD OF REVIEW

This court's review is limited to determining whether the Commissioner's decision is

supported by substantial evidence.  42 U.S.C. § 405(g); *Adorno v. Shalala*, 40 F.3d 43, 46 (3d

Cir. 1994).  The court may not undertake a *de novo* review of the Commissioner's decision or

reweigh the evidence of record. *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir.

1986).  Congress has expressed its intention that "[t]he findings of the Commissioner of Social

Security as to any fact, if supported by substantial evidence, shall be conclusive . . . . " 42 U.S.C.

§ 405(g).  Substantial evidence "does not mean a large or considerable amount of evidence, but

rather 'such relevant evidence as a reasonable mind might accept as adequate to support a

conclusion.'" *Pierce v. Underwood*, 487 U.S. 552, 565 (1988) (quoting *Consolidated Edison Co.

v. NLRB*, 305 U.S. 197, 229 (1938).  As long as the Commissioner's decision is supported by

substantial evidence, it cannot be set aside even if this court "would have decided the factual

inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  "Overall, the

substantial evidence standard is a deferential standard of review." *Jones v. Barnhart*, 364 F.3d

501, 503 (3d Cir. 2004) (citing *Schaudeck v. Comm'r of Soc. Sec. Admin.*, 181 F.3d 429, 431 (3d Cir. 1999).

## V.    DISCUSSION

In order to establish a disability under the Act, a claimant must demonstrate a "'medically determinable basis for an impairment that prevents him from engaging in any 'substantial gainful activity' for a statutory twelve-month period.'"  *Stunkard v. Sec'y, Health & Human Servs.*, 841 F.2d 57, 59 (3d Cir. 1988) (quoting *Kangas v. Bowen*, 823 F.2d 775, 777 (3d Cir. 1987); *see* 42 U.S.C. § 423(d)(1).  A claimant is considered to be unable to engage in substantial gainful activity "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . . "  42 U.S.C. § 423(d)(2)(A).  To support ultimate findings, an administrative law judge must do more than state factual conclusions.  The administrative law judge must make specific findings of fact. *Stewart v. Sec'y of HEW*, 714 F.2d 287, 290 (3d Cir. 1983).  The administrative law judge must consider all medical evidence contained in the record and must provide adequate explanations for disregarding or rejecting evidence. *Weir ex. rel Weir v. Heckler*, 734 F.2d 955, 961 (3d Cir. 1984); *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

The Social Security Administration ("SSA"), acting pursuant to its rulemaking authority under 42 U.S.C. § 405(a), has developed a five-step sequential evaluation process for the purpose of determining whether a claimant is "disabled" within the meaning of the Act.  The United States Supreme Court summarized this process as follows:

> If at any step a finding of disability or nondisability can be made, the SSA will not review the claim further. At the first step, the agency will find nondisability unless the claimant shows that he is not working at a "substantial gainful activity." [20 C.F.R.] §§ 404.1520(b), 416.920(b). At step two, the SSA will find non-disability unless the claimant shows that he has a "severe impairment," defined as "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities." §§ 404.1520(c), 416.920(c). At step three, the agency determines whether the impairment which enabled the claimant to survive step two is on the list of impairments presumed severe enough to render one disabled; if so, the claimant qualifies. §§ 404.1520(d), 416.920(d). If the claimant's impairment is not on the list, the inquiry proceeds to step four, at which the SSA assesses whether the claimant can do his previous work; unless he shows that he cannot, he is determined not to be disabled. If the claimant survives the fourth stage, the fifth, and final, step requires the SSA to consider so-called "vocational factors" (the claimant's age, education, and past work experience), and to determine whether the claimant is capable of performing other jobs existing in significant numbers in the national economy. §§404.1520(f), 404.1560(c), 416.920(f), 416.960(c).

*Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003)(footnotes omitted).

Plaintiff makes two arguments: 1) the ALJ erred in not fully crediting the opinion of Dr. Kelly and 2) the ALJ erred in determining plaintiff's RFC. Each argument will be addressed.

### 1) Weight given to the opinion of Dr. Kelly

Plaintiff's first challenge to the Commissioner's decision is that the ALJ erred by failing to credit the opinion of Dr. Kelly, plaintiff's long-time treating neurologist, in the absence of contradictory medical evidence of record and in contravention of the "treating physician rule" recognized by the United States Court of Appeals for the Third Circuit. The essence of plaintiff's argument is that the ALJ failed to give controlling weight to the opinion of Dr. Kelly as expressed in the September 14, 2007, correspondence to plaintiff's counsel. Plaintiff argues that Dr. Kelly's opinion is uncontradicted by other medical evidence in the record.

The United States Court of Appeals for the Third Circuit has consistently emphasized that "[a] cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'" *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (quoting *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999) (quoting *Rocco v. Heckler*, 826 F.2d 1348, 1350 (3d Cir.1987))). A treating physician's medical opinion will be entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" contained in the longitudinal record. 20 C.F.R. § 416.927(d)(2). A treating physician's opinion can only be rejected on the basis of contrary medical evidence. *Frankenfield v. Bowen*, 861 F.2d 405, 408 (3d Cir. 1988). The administrative law judge must indicate in her decision the reasons for rejecting such evidence. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981).

In her decision, the ALJ explained that she did not give Dr. Kelly's opinion controlling weight "because the opinion is not supported by extensive treatment notes, laboratory studies or clinical findings, and because it was written prior to the date the claimant achieved better control of her condition." (R. at 14.) She gave greater weight to the overall treatment record. (R. at 13.)

The ALJ observes that Dr. Kelly's treatment notes concerning plaintiff's grand mal seizures in 2007 were a record of plaintiff calling in to report that they occurred, and, in the case of the first two, well after they happened. (R. at 13.) The ALJ further notes that plaintiff had not suffered a grand mal seizure since June 2007, more than a year prior to the administrative hearing. (*Id.*) There were no medical records for the year 2008 submitted. The ALJ details

inconsistencies in the record, including discrepancies relating to why plaintiff had stopped

working, the frequency and duration of her seizures, and the extent of her exertional limitations.

(R. at 14-15.)  The ALJ found plaintiff's activities of daily living to be incongruous with the level

of disability she claims.  (R. at 15.)

Plaintiff argues that there is no contradictory medical evidence contained in the

longitudinal record that contradicts Dr. Kelly's opinion.  Indeed, there is no medical evidence of

record that addresses plaintiff's epilepsy and in that sense plaintiff is correct.  The ALJ did not

discredit the epilepsy diagnosis.  Plaintiff's argument, however, ignores the medical evidence

after the grand mal seizures.  The ALJ credited Dr. Kelly's medical findings with respect to her

seizure activity, and provided for them in her RFC, by requiring a safe environment in case

plaintiff should experience a grand mal seizure, and limiting the concentration and pace

requirements to accommodate plaintiff's petit mal seizures.  The only opinion rendered by Dr.

Kelly that was rejected by the ALJ was that plaintiff's seizure activity "prevents her from

engaging in any type of consistent work activity."  (R. at 269.)  Dr. Kelly's concluded his letter

dated September 14, 2007, over a year prior to the hearing before that ALJ:

> In summary, because of the nearly daily occurrence of the patient's
> complex partial seizures and the intermittent occurrence of grand mal
> seizures, frequently associated with trauma, I do not believe that the
> patient is capable of engaging in any substantial gainful activity.
> Within a reasonable degree of medical certainty, her poor seizure
> control warrants strong consideration for social security disability
> benefits.

(*Id.*)

There are two reasons why the ALJ was not required to credit this opinion.  First, where a

treating physician's opinion is conclusory and not supported by medical evidence it is not entitled

to any special weight. *Jones v. Sullivan*, 954 F.2d 125, 129 (3d Cir. 1991).  "The more a medical

15

source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion. The better an explanation a source provides for an opinion, the more weight we will give that opinion." 20 C.F.R. § 404.1527(d)(3). Second, a medical opinion expressed by a treating source on a matter reserved for the Commissioner, such as a statement that a claimant is "disabled" or "unable to work," is not dispositive or controlling. *Adorno v. Shalala*, 40 F.3d 43, 47-48 (3d Cir. 1994) (quoting *Wright v. Sullivan*, 900 F.2d 675, 683 (3d Cir. 1990), citing *Newhouse v. Heckler*, 753 F.2d 283, 286 (3d Cir. 1985)) ("[T]his type of [medical] conclusion cannot be controlling. 20 C.F.R. § 404.1527 (1989) indicates that '[a] statement by your physician that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled. We have to review the medical findings and other evidence that support a physician's statement that you are 'disabled.''"). The ultimate determination of disability is a legal conclusion reserved exclusively to the Commissioner, and a treating physician's opinion on the matter is neither conclusive nor binding on the administrative law judge. 20 C.F.R. § 404.1527(e)(1) and (3).

For these reasons, and with the applicable precedents of the United States Court of Appeals for the Third Circuit in mind, the court concludes that substantial evidence supports the ALJ's findings regarding plaintiff's seizures, and her rejection of Dr. Kelly's opinion that plaintiff's seizures render her incapable of engaging in substantial gainful activity did not contravene the treating physician rule.

### 2. RFC determination

Plaintiff argues that the ALJ's RFC determination failed to provide for the impaired consciousness resulting from plaintiff's seizures. Plaintiff observes that the VE testified that no

jobs existing in the national economy would be available for an individual who would be off task ten to fifteen percent in an eight-hour workday.

There is no evidence contained in the record that plaintiff's seizure activity would result in plaintiff being off task ten to fifteen percent per eight-hour workday. The ALJ did accommodate the credibly established limitations that could be expected to result from plaintiff's seizure activity in the RFC determination. The ALJ may use her discretion, in consultation with medical opinion, to determine a claimant's RFC. 20 C.F.R. §§ 404.1527(e), 416.927(e); Social Security Ruling 96-5p. The ALJ need only include those limitations which are credible in her RFC determination. *See Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 121 (3d Cir. 2000); *see also Hartranft*, 181 F.3d at 362. Despite plaintiff's insistence that the ALJ erred in determining the RFC, there is no specific medical evidence in the record to support plaintiff's position. The court finds that the ALJ's RFC assessment of plaintiff was supported by substantial evidence.

## VI.    CONCLUSION

Because substantial evidence supports the ALJ's decision, plaintiff's motion for summary judgment will be denied. The Commissioner's motion for summary judgment will be granted, and the administrative decision of the Commissioner will be affirmed. An appropriate order shall issue.

By the court,

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
United States District Judge

Dated: July 30, 2010